UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PAMLAB, L.L.C., | ) CIVIL ACTION NO. 2:11-_____ |
| | ) |
| Plaintiff, | ) SECTION __ |
| | ) |
| | ) MAGISTRATE DIVISION __ |
| v. | ) |
| | ) **JURY DEMANDED** |
| ACELLA PHARMACEUTICALS, LLC, ARIZONA | ) |
| NUTRITIONAL SUPPLEMENTS, INC., ULTIMATE | ) |
| FORMULATIONS, INC. d/b/a BEST | ) |
| FORMULATIONS, LIANYUNGANG JINKANG | ) |
| PHARMACEUTICAL TECHNOLOGY CO., LTD., | ) |
| MARK W. PUGH AND HAROLD A. DEAS, JR., | ) |
| | ) |
| Defendants. | ) |

## ORIGINAL COMPLAINT

Plaintiff Pamlab, L.L.C. ("Pamlab") files this Complaint against Defendants Acella Pharmaceuticals, LLC ("Acella"), Arizona Nutritional Supplements, Inc. ("Arizona"), Ultimate Formulations, Inc. d/b/a Best Formulations ("Best"), Lianyungang Jinkang Pharmaceutical Technology Co., Ltd. ("LJ Pharma"); Mark W. Pugh ("Pugh") and Harold A. Deas, Jr. ("Deas") (collectively, "Defendants") and allege as follows:

1.      This action arises out of Defendants' knowing and willful false and misleading advertising and promotion of their pharmaceutical products.  Defendants' actions constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); federal unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); violation of 51:1405(A) of the Louisiana Unfair Trade Practices and Consumer Protection Law; and unfair competition and misappropriation in violation of Louisiana common law.  Plaintiff seeks temporary, preliminary and permanent injunctive relief; actual damages; punitive damages; and recovery of Plaintiff's costs and reasonable attorneys' fees incurred in connection with this action.

## PARTIES

2.     Pamlab is a limited liability company organized under the laws of Louisiana, having its principal place of business in Covington, St. Tammany Parish, Louisiana.  Pamlab is a fully integrated pharmaceutical company that specializes in the development of prescription medical foods and nutritional supplements that are marketed and sold nationally.  Among the products Pamlab markets is Cerefolin® ("CEREFOLIN") and CerefolinNAC® ("CEREFOLIN-NAC"), orally administered prescription medical foods for the dietary management of certain metabolic processes identified with early memory loss; Deplin® ("DEPLIN"), an orally administered prescription medical food for the dietary management of patients suffering from depression and suboptimal folate levels; Neevo® ("NEEVO"), a prescription medical food for the dietary management of impaired metabolic processes in women who face high to intermediate risk pregnancies and are unable to fully metabolize or absorb folic acid; and Neevo DHA® (NEEVO DHA), a multivitamin/multimineral nutritional supplement for women who require increased vitamin, mineral and essential fatty acid concentrations throughout pregnancy and in the postnatal period.   Unlike products containing folic acid, CEREFOLIN and CEREFOLIN-NAC, DEPLIN, NEEVO and NEEVO DHA (collectively, the "PAMLAB PRODUCTS") have the active, naturally occurring form of folate (L-methylfolate) used by the body.  The PAMLAB PRODUCTS are available by prescription only.

3.     Defendant Acella is a limited liability company organized under the laws of Delaware and having its principal place of business at 9005 Westside Parkway, Fulton County, Georgia 30004.  Acella markets, promotes, advertises, offers for sale, sells, and distributes an allegedly "generic" version of CEREFOLIN it calls "Enfolast"; an allegedly "generic" version of CEREFOLIN-NAC it calls "Enfolast-N"; an allegedly "generic" version of DEPLIN it calls "L-Methylfolate Calcium Tablets," an allegedly "generic" version of NEEVO it calls "PNV Iron";

and an allegedly "generic" version of NEEVO DHA it calls "PNV-DHA Plus" (collectively, the "ACELLA PRODUCTS") which it labels as containing the same active ingredients in the same strengths as CEREFOLIN, CEREFOLIN-NAC, DEPLIN, NEEVO, and NEEVO DHA respectively, to customers including wholesalers, retailers, chains, distributors, mail order houses, independent pharmacies, managed care organizations and/or others throughout the United States, including in the Eastern District of Louisiana. Acella may be served with process by serving a copy of the Complaint on its registered agent for service of process: Christopher E. Parker, 1170 Peachtree Street NE, Atlanta, Georgia 30309.

4.      Defendant Arizona is a corporation organized under the laws of Arizona and having its principal place of business at 210 S. Beck, Chandler, Arizona 85226. Upon information and belief, Arizona manufactures Enfolast, Enfolast-N, L-methylfolate Calcium Tablets and PNV Iron for Acella. Arizona may be served with process by serving a copy of the Complaint on its Registered Agent: Allyn Langford, 210 S. Beck, Chandler, Arizona 85226.

5.      Defendant Best is a corporation organized under the laws of California and having its principal place of business at 938 Radecki Court, City of Industry, California, 91748. Upon information and belief, Best manufactures PNV-DHA Plus for Brookstone. Best may be served with process by serving a copy of the Complaint on its Registered Agent: Charlie Ung, 17758 Rowland Street, City of Industry, California 91748.

6.      Upon information and belief, Defendant LJ Pharma is a limited liability company organized under the laws of China, having its principal place of business at Jinshan Industrial Park, Ganyu County, Lianyungang Jiangsu Province, 222115, China. LJ Pharma manufactures and sells the D,L-methylfolate ingredient Acella calls "Xolafin-B™" that is used in the manufacture of the ACELLA PRODUCTS to Acella.

7.    Defendant Pugh is a natural person employed by Defendant Acella as its President, and a citizen of the State of Georgia.  Pugh holds a 47.5% ownership interest in Acella.  Pugh is actively involved in the business of Acella, and Acella operates under Pugh's leadership, direction, support and/or approval.

8.    Defendant Deas is a natural person employed by Defendant Acella as its Chief Operating Officer, and a citizen of the State of Georgia.  Deas holds a 47.5% ownership interest in Acella.  Deas is actively involved in the business of Acella, and Acella operates under Deas' leadership, direction, support and/or approval.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*.  This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction.  Additionally, the amount in controversy exceeds $75,000 and involves citizens of different states.

10.    The exercise of personal jurisdiction in Louisiana is proper because acts giving rise to Plaintiff's causes of action have occurred in the State of Louisiana and, more particularly, within the Eastern District of Louisiana.  More specifically, and under the authorization of and/or at the direction of Pugh and Deas, Acella markets, promotes, advertises, offers for sale, sells and/or distributes the ACELLA PRODUCTS to customers including wholesalers, retailers, chains, distributors, mail order houses, independent pharmacies, managed care organizations and/or others throughout the United States, including in the Eastern District of Louisiana. Defendants have purposefully and voluntarily placed the ACELLA PRODUCTS into the stream of commerce with the expectation that it will be purchased by consumers in the Eastern District of Louisiana.  Consumers have purchased and continue to purchase the ACELLA PRODUCTS in

the Eastern District of Louisiana.  Furthermore, under the authorization of and/or at the direction

of Pugh and Deas, Acella falsely promotes the ACELLA PRODUCTS as generic equivalents to

and substitutes for the PAMLAB PRODUCTS to customers including wholesalers, retailers,

chains, distributors, mail order houses, independent pharmacies, managed care organizations,

and/or others throughout the United States, including in the Eastern District of Louisiana.

     11.     Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391.

## BACKGROUND

## Folate, Folic Acid, D,L-methylfolate and L-methylfolate

     12.     Folates are water-soluble B-vitamins that play a key role in central metabolic

pathways.  Folates are, for example, needed to help the body make healthy new cells.  Because

of its intimate role in the synthesis of nucleotides, which are needed for DNA synthesis and

repair, adequate folate nutrition is vitally important for all cells.  Tissues that are most susceptible

to an inadequate supply of folate include those that require rapid cell growth and replication such

as the intestine, the immune system, the bone marrow, and a developing fetus.

     13.     Low folate intake can lead to high homocysteine levels (hyperhomocysteinemia)

which have been associated with serious vascular, ocular and neurological disorders including

Alzheimer's disease and depression.  When a person has insufficient usable folate levels in the

brain, it adversely affects the production and synthesis of neurotransmitters in the brain.  Low

folate levels have been linked to poorer antidepressant response to selective serotonin reuptake

inhibitors.

     14.     Folate is an especially critical vitamin for prenatal health.  An adequate

preconceptional intake of total folate lessens the risk of having a baby with serious birth defects

of the brain and spinal cord called "neural tube defects," or with cleft lip or palate.  The critical

time interval for preventing neural tube defects is 8-12 weeks prior to conception, and within 4

weeks following conception.  It is well recognized that folic acid supplementation and food fortification reduce the risk of such birth defects.

15.     Human cells cannot produce folates.  Instead a person must obtain folate either from dietary sources or from supplements.  The naturally occurring form of folate that is directly usable by cells in the human body is L-methylfolate.  L-methylfolate is the body's preferred form of folate, and the only one able to cross the blood-brain barrier.

16.     L-methylfolate is the predominant form of folate in natural food; it is found, for example, in green, leafy vegetables.  However, during the cooking and processing of food, folates are lost, and many people are unable to obtain sufficient L-methylfolate from their diet alone to satisfy their folate needs.

17.     While L-methylfolate is the naturally occurring form of folate and is found in natural foods, it is not easily synthesized into a stable supplement.  Folic acid, a source of folate which does not occur in nature, is much easier to fabricate; it was first synthesized in 1945.  Until approximately 2001, folic acid was the only source of folate supplementation commonly available in the United States.

18.     Folic acid is widely available in multivitamins and as a dietary supplement.  In addition, folic acid is added to many processed foods.  While many people can easily metabolize folic acid and convert it into L-methylfolate, it is estimated that over 50% of Americans suffer from a genetic mutation that limits their bodies' ability to metabolize folic acid.  One such mutation is called MTHFR C→T polymorphism.  Studies show that plasma folate concentrations are significantly lower and homocysteine (an amino acid related to coronary and vascular disease) is mildly elevated in individuals with MTHFR C→T polymorphism.

19.     In short, while folic acid has helped tens of millions of Americans obtain proper L-methylfolate levels, common genetic mutations have left tens of millions more with insufficient amounts of this key nutrient.

20.     L-methylfolate (also known by the synonyms 6(S)-5-MTHF; calcium L-5-methyltetrahydrofolate; L-methyltetrahyrdrofolic acid, calcium salt; or L-5-MTHF, among others) (hereinafter "L-methylfolate") must be distinguished from its diastereoisomeric opposite, D-methylfolate, and the mixture of D-methylfolate and L-methylfolate, called D,L-methylfolate.

21.     Many compounds occur as mixtures of two or more diastereoisomers. Diastereoisomers have the same chemical composition and have the same atoms bonded to other atoms, but differ in the spatial arrangement of the atoms.

22.     The various diastereoisomers that are present in such mixtures may have radically different properties from one another.  In many cases, one diastereoisomer can have a therapeutic effect, while another diastereoisomer is therapeutically ineffective.  In the most severe instances, one diastereoisomer may be highly toxic while another diastereoisomer of the same compound may have incredible pharmacological utility.  Thus, there are often great benefits to providing patients and consumers with a product that contains only a single diastereoisomer as opposed to a diastereoisomeric mixture.

23.     Diastereoisomers are distinguished from one another through naming conventions that reflect their different properties.  One such naming convention uses a "D" in the name of the compound for one diastereoisomer and an "L" in the name of the compound to indicate a different diastereoisomer.

24.     The L-methylfolate diastereomer is different from and superior to the D-methylfolate diastereomer because the L-form is the naturally occurring, predominant form of folate found in food and the human body.  The L-form is the biologically active form of folate

and has proven to have a high degree of bioavailability (the rate at which a drug or other substance is available at the targeted place in the body) in humans.  In contrast, the D-form is an unnatural form of folate, from which humans are unable to obtain nutritional benefit.

25.     L-methylfolate is the pure diastereoisomeric form of folate used by cells in the body.  In humans, this particular compound is the predominant form in circulation and transport into the tissues, and it is the only folate that can cross the blood-brain barrier.

26.     While the D-form is useless as a source of folate nutrition, it is not inert.  For example, scientific evidence shows that the unnatural D-form accumulates in the human body. Further, the evidence suggests that the D-methylfolate diastereoisomer competes with the body's uptake of the L-methylfolate diastereoisomer and therefore reduce the overall usability of the compound.

27.     In the mid-1990's, Merck & Cie (formerly known as Merck Eprova AG) ("Merck") made a key breakthrough, and invented a process to synthesize L-methylfolate in a stable form. Offered under the name Metafolin® (METAFOLIN), L-methylfolate calcium[1] is the crystalline, stable and diastereoisomerically pure form of folate directly usable by cells in the body.

28.     L-methylfolate calcium is defined throughout the world in compendial standards and submissions to government agencies – including the FDA – as a substantially diastereoisomerically pure dietary ingredient which has 1% or less of the D-methylfolate isomer. Each batch of METAFOLIN is tested by Merck to ensure that it meets these standards.

29.     METAFOLIN is protected by a comprehensive set of patents and patent applications on the substance, key intermediates, production processes and its use in specific

---

[1] The terms L-methylfolate and L-methylfolate calcium will be used interchangeably.  Although the ingredient used in the manufacture of the PAMLAB PRODUCTS is accurately termed L-methylfolate calcium, once ingested, the calcium ion dissociates from the L-methylfolate molecule, leaving L-methylfolate as a free acid.  The free acid form of L-methylfolate is the active component of the molecule in the human body.

fields.  In January 2000, Pamlab entered into an exclusive license agreement with Merck, under which Pamlab was granted a license to make, use and sell certain dietary supplements, formulations or medical foods using L-methylfolate.

## Pamlab Develops Innovative Medical Foods Using L-Methylfolate to Assist Patients with Chronic Diseases and Conditions

30.     Pamlab is an integrated specialty pharmaceutical company with development and commercial capabilities focused primarily on prescription medical foods.  Among its specific focus areas are the development of therapies using folate and vitamin $B_{12}$ to address the needs of patients suffering from a variety of chronic diseases or conditions, including diabetic peripheral neuropathy, dementia, depression, and high-risk pregnancy.

31.     Each of the PAMLAB PRODUCTS use L-methylfolate calcium as an active ingredient.  Unlike medical foods containing folic acid that must undergo several metabolic steps before they can be used in the body, the PAMLAB PRODUCTS provide the active form of folate, L-methylfolate, to patients.  The body's ability to use the L-methylfolate provided by the PAMLAB PRODUCTS is unaffected by MTHFR C→T polymorphism.  The use of L-methylfolate calcium is described on the PAMLAB PRODUCTS' labels and package inserts. The presence of this dietary ingredient in the PAMLAB PRODUCTS is used as the more significant selling point by Pamlab, and distinguishes it from the many products available which provide folate in the form of folic acid.  While the L-methylfolate in the PAMLAB PRODUCTS does not need to be converted by the body prior to use but instead is a form of folate which can cross the blood-brain barrier, folic acid must be metabolized through a complex four-step process before it can be used by the body's cells, including those in the brain:



**Pamlab Develops CEREFOLIN and CEREFOLIN NAC to Help Patients with Early Memory Loss**

32.     As people age, reduced antioxidant levels in the brain pave the way for the onset of disease and age-related conditions such as memory loss.  Antioxidants are substances or nutrients in foods which can prevent or slow oxidative damage to the body.  When the body's cells use oxygen, they naturally produce substances known as oxidants or free radicals.  Free radicals are damaging, unbalanced oxygen-containing molecules that are considered major culprits in aging and disease.  Excessive levels of free radicals can damage a cell's lipids, protein or DNA and disturb normal function.  Antioxidants act as "free radical scavengers" and hence prevent and repair damage done by these free radicals.   "Oxidative stress" represents an imbalance between the production and manifestation of free radicals and the body's ability to reduce their destructive effect and repair the resulting damage.

33.     Although the etiology of Alzheimer's disease remains largely unclear, recent studies show that oxidative stress plays an important role in the disease pathophysiology. Researchers have discovered that accumulations of amyloid plaques in the brain lead to oxidative stress.  Over time, oxidative damage is toxic to neurons.  The brain's unique characteristics, including its high rate of metabolism and its long-living cells, make it particularly susceptible to oxidative damage.

34.     Maintaining sufficient antioxidant levels is key to preventing oxidative damage and/or controlling its spread.  Because antioxidant resources are depleted with age, there is a constant need to replenish them through dietary intake of antioxidants.

35.     Pamlab began marketing CEREFOLIN in March of 2004.   CEREFOLIN's formulation provides 6 mg L-methylfolate calcium, along with 5 mg vitamin $B_2$ (riboflavin), 50 mg vitamin $B_6$ (pyridoxine), and 1 mg vitamin $B_{12}$ (cyanocobalamin).  CEREFOLIN is used to manage the distinct nutritional requirements of individuals under treatment for early memory loss with particular emphasis on those individuals diagnosed with or at risk for neurovascular oxidative stress and/or hyperhomocysteinemia, mild to moderate cognitive impairment with or without vitamin $B_{12}$ deficiency, vascular dementia or Alzheimer's disease.   CEREFOLIN combats progressive memory loss by reducing oxidative stress and supporting the synthesis of acetylcholine, an important neurotransmitter associated with memory.  As neurons die, the brain struggles to maintain normal levels of acetylcholine.   The L-methylfolate in CEREFOLIN provides the methyl group needed for the synthesis of Phosphotydal Choline (PC), a precursor to acetylcholine.

36.     Pamlab began marketing an enhanced formula of CEREFOLIN called CEREFOLIN NAC in March of 2006.  Like CEREFOLIN, CEREFOLIN NAC is an orally administered prescription medical food for the dietary management of certain metabolic

processes identified with early memory loss.   CEREFOLIN's formulation provides 6 mg L-methylfolate calcium, along with 2 mg methylcobalamin, the principal form of circulating vitamin $B_{12}$, and 600 mg N-acetylcysteine, a precursor to glutathione, one of the body's most potent natural antioxidants.   Like CEREFOLIN, CEREFOLIN NAC manages the distinct nutritional requirements of people suffering from early memory loss, particularly in those diagnosed with or at risk for neurovascular oxidative stress and/or hyperhomocysteinemia, mild to moderate cognitive impairment, vascular dementia or Alzheimer's disease.   In addition to supporting the synthesis of acetylcholine, CEREFOLIN NAC is designed to increase the body's production of glutathione, the brain's most important scavenger of pro-oxidant free radicals. CEREFOLIN NAC provides potent antioxidant protection and prevents neuronal death.

### Pamlab Develops DEPLIN to Help Patients with Depression

37.     One in six Americans will experience an episode of major depression in their lifetime.  In any given year, over 18 million people will have a depressive illness that warrants treatment.  Depression can be a serious and even life-threatening disease.  Its symptoms may include persistent sad, anxious or empty feelings; feelings of hopelessness and/or pessimism; feelings of guilt, worthlessness and/or helplessness; irritability, restlessness, loss of interest in activities or hobbies once pleasurable; fatigue and decreased energy; difficulty concentrating, remembering details, and making decisions; insomnia, early-morning wakefulness, or excessive sleeping, overeating or appetite loss; thoughts of suicide and suicide attempts; and persistent aches or pains, headaches, cramps or digestive problems that do not ease even with treatment.

38.     Depression is associated with an imbalance of the three neurotransmitters (chemical messengers) in the brain associated with mood:  serotonin, norepinephrine and dopamine.   Most antidepressants are believed to work by addressing the imbalance of neurotransmitters in the brain.  Antidepressants such as SSRIs (selective serotonin reuptake

inhibitors) and SNRIs (serotonin, norepinephrine reuptake inhibitors) do this by blocking the reabsorption of neurotransmitters allowing the brain to have greater use of available neurotransmitters.

39.     Unfortunately, almost two-thirds (2/3) of depressed patients have lingering symptoms or no response after antidepressant therapy. This partial or non-response to treatment is common when the brain lacks adequate neurotransmitters due to insufficient usable folate in the brain. In such patients, antidepressants cannot fully work.

40.     Pamlab developed and began marketing DEPLIN in select markets in 2006, and nationally in 2007 as an orally administered medical food for the dietary management of suboptimal folate levels in depressed patients. DEPLIN is designed to help antidepressants work better by correcting folate levels in the brain. DEPLIN is formulated in two strengths, and delivers 7.5 mg or 15 mg of L-methylfolate. L-methylfolate boosts the synthesis of serotonin, norepinephrine and dopamine. By managing trimonoamine neurotransmitter synthesis, the L-methylfolate in DEPLIN improves the way antidepressants work. This unique feature allows DEPLIN the chance to help the 70% of patients with depression who have a compromised ability to metabolize folic acid into L-methylfolate.

### Pamlab Develops NEEVO and NEEVO DHA to Help Patients Who May Be Subject to Problem Pregnancies

41.     Without genetic testing, it is impossible to know which individuals are affected by the MTHFR C→T polymorphism. However, it is believed that 9% to 12% of the general population lack the enzyme activity needed to fully metabolize folic acid, and another 44% cannot fully metabolize folic acid to its active form. Pregnant women affected by the MTHFR C→T polymorphism receive very little if any folate benefit from typical prenatal vitamins or

over-the-counter supplements, and their fetuses remain at risk for neural tube defects and all other folate related conditions.

42.     Pamlab began marketing NEEVO in January of 2007.  NEEVO is a medical food for use only under medical supervision for the dietary management of impaired metabolic processes in women who face high to intermediate risk pregnancies and are unable to fully metabolize or absorb folic acid.  Because NEEVO contains L-methylfolate, which does not require metabolism by the body, NEEVO helps to meet the distinct nutritional needs of pregnant women with the MTHFR C→T polymorphism.

43.     Pamlab began marketing NEEVO DHA in March of 2009.  NEEVO DHA is a multivitamin/multimineral nutritional supplement for women who require increased vitamin, mineral and essential fatty acid concentrations throughout pregnancy and the post natal period for both lactating and non-lactating mothers.  It can also be used prior to conception to improve nutrition.  Like NEEVO, NEEVO DHA also contains L-methylfolate, which does not require metabolism by the body.  It also contains iron, calcium, other vitamins and minerals and omega-3 fatty acids.  NEEVO DHA has become one of the nation's fastest growing and largest prescription prenatal vitamins.

### Through its Efforts, Pamlab Has Built a Substantial Market for the Pamlab Products

44.     Pamlab has expended substantial resources developing the PAMLAB PRODUCTS.  Since their launch, Pamlab's sales representatives have met with doctors and other prescribers not only to provide information on the use and benefits of the PAMLAB PRODUCTS, and also to provide doctors with samples of the PAMLAB PRODUCTS.  Pamlab's efforts have succeeded to the extent that its combined sales of the PAMLAB PRODUCTS are expected to exceed $100,000,000 by the end of 2010.

90251251.6

**Defendants Develop and Market Their Knock-Off Products to Exploit Pamlab's Success**

45.     Acella is a Georgia-based pharmaceutical company that develops, manufactures, markets and sells what it calls "niche generic pharmaceuticals," or "specialty generic products." Acella does not market its alleged generic equivalent drug products to physicians.  Rather, it convinces drug wholesalers, distributors, pharmacies, pharmacists and national drug databases that its products are generic substitutes for brand-name drugs.  Its sales result from "generic" substitution of its products for brand-name drugs.

46.     Acella was founded in 2007 by Mark Pugh and Art Deas.  By virtue of their status as President and Chief Operating Officer respectively, Pugh and Deas have at all relevant times had the right and ability to authorize, approve, supervise and/or direct Acella's activities and have also had a direct financial interest in such activities.

47.     Acella promotes, markets, sells and distributes its products nationwide, including in Louisiana and this judicial district.

48.     Arizona is an Arizona-based contract manufacturer of nutritional and dietary supplements.  The products Arizona manufactures are promoted, marketed, sold and distributed nationwide, including in Louisiana and this judicial district.

49.     Best is a California-based contract manufacturer and private labeler of nutritional and dietary supplements.  The products Best manufactures are promoted, marketed, sold and distributed nationwide, including in Louisiana and this judicial district.

50.     LJ Pharma is a Chinese manufacturer of active pharmaceutical ingredients and pharmaceutical intermediates.  LJ Pharma has not been certified as complying with good manufacturing practices applicable to drug products.  LJ promotes and markets its products worldwide via its website, including in Louisiana and this judicial district.  The ingredients LJ

Pharma manufactures are used in medical foods and dietary supplements promoted, marketed, sold and distributed nationwide, including in Louisiana and this judicial district.

51.     Sometime in 2010, Acella saw an opportunity to exploit the reputation and success of the PAMLAB PRODUCTS by creating the ACELLA PRODUCTS.  Specifically, and at the direction of Pugh and Deas, Acella engaged in the distribution, marketing, sale and/or offer for sale of the ACELLA PRODUCTS as alleged generic versions of the PAMLAB PRODUCTS. Upon information and belief, Acella contracted with Arizona and Best to manufacture and label the ACELLA PRODUCTS for Acella.   Acella contracted with LJ Pharma to provide an ingredient Acella calls "Xolafin-B" for use in the manufacture of the ACELLA PRODUCTS.

52.     Upon information and belief, neither Arizona nor Best manufactures or tests the ACELLA PRODUCTS in conformance with uniformly accepted quality control or good manufacturing practices.  Upon information and belief, neither Arizona nor Best have validated the manufacturing processes they use to manufacture the ACELLA PRODUCTS.  Also, and upon information and belief, Arizona and Best do not test the finished ACELLA PRODUCTS to determine the actual strength of the active ingredients contained in the ACELLA PRODUCTS at release, or to establish/support their expiration dating.

53.     Through at least their labels, product inserts and marketing materials, Defendants have represented that Enfolast has the same active ingredients in the same amounts as CEREFOLIN and has the following dietary ingredients in the following amounts:

L-Methylfolate Calcium (as Xolafin-B™) ............................    6 mg
Riboflavin ($B_2$) ...................................................................    5 mg
Pyridoxine ($B_6$) ....................................................................  50 mg
Cyanocobalamin ($B_{12}$) ..........................................................    1 mg

54.     Through at least their labels, product inserts and marketing materials, Defendants have represented that Enfolast-N has the same active ingredients in the same amounts as CEREFOLIN NAC, and has the following dietary ingredients in the following amounts:

L-Methylfolate Calcium (as Xolafin-B™) .............................     6 mg
Methylcobalamin  ...............................................................     2 mg
N-Acetylcysteine ................................................................     600 mg

55.     Through at least their labels, product inserts and marketing materials, Defendants have represented that L-Methylfolate Calcium 7.5 mg Tablets have the same active ingredients in the same amounts as DEPLIN 7.5 mg Tablets and have L-methylfolate Calcium [6(s)-5-MTHF] (as Xolafin-B™) 7.5 mg, as an active ingredient.

56.     Through at least their labels, product inserts and marketing materials, Defendants have represented that L-Methylfolate Calcium 15 mg Tablets have the same active ingredients in the same amounts as DEPLIN 15 mg Tablets and have L-methylfolate Calcium [6(s)-5-MTHF] (as Xolafin-B™) 15 mg, as an active ingredient.

57.     Through at least their labels, product inserts and marketing materials, Defendants have represented that PNV Iron has the same active ingredients in the same amounts as NEEVO, and has the following dietary ingredients in the following amounts:

L-Methylfolate Calcium (as Xolafin-B™) .............................     1 mg
Vitamin $B_6$ (pyridoxine as pyridoxine HCL)  .........................     2.6 mg
Iron (as polysaccharide iron complex) ...................................     29 mg
Vitamin $B_9$ (folic acid) ..........................................................     0.4 mg
Vitamin C (ascorbic acid) .....................................................     80 mg
Vitamin $B_{12}$ (cyanocobalamin) ..............................................     0.5 mg
Vitamin $D_3$ ..........................................................................     400 IU
Biotin ..................................................................................     0.03 mg
Vitamin E (dl-alpha tocopherol acetate) ...............................     30 IU
Copper (copper oxide) ..........................................................     2 mcg
Vitamin $B_1$ (thiamine as thiamine mononitrate) ....................     3 mg
Zinc (as zinc oxide)  ............................................................     15 mg
Vitamin $B_2$ (riboflavin) .........................................................     3.4 mg
Calcium (calcium carbonate) ...............................................     200 mg
Vitamin $B_3$ (niacinamide) .....................................................     20 mg

Magnesium (magnesium oxide) ............................................   40 mg
Vitamin $B_5$ (pantothenic acid as d-calcium pantothenate) ......   7 mg

58.     Through at least their labels, product inserts and marketing materials, Defendants have represented that PNV DHA Plus has the same active ingredients in the same amounts as NEEVO DHA and has the following dietary ingredients in the following amounts:

L-Methylfolate Calcium (as Xolafin-B™) .............................   1.13 mg
Calcium (tricalcium phosphate) .............................................   75 mg
Elemental Iron (as ferrous fumarate)......................................   27 mg
Vitamin C (ascorbic acid) .......................................................   40 mg
Vitamin E (D-alpha tocopherol) ............................................   30 IU
Vitamin $B_6$ (pyridoxine as pyridoxine HCL) .........................   25 mg
Vitamin $B_9$ (folic acid) ...........................................................   400 mcg
Vitamin $B_{12}$ (methylcobalamin) ............................................   1 mg
Docosahexaenoic Acid (DHA)................................................   250 mg

59.     Specifically, Defendants label all of the ACELLA PRODUCTS as containing "L-methylfolate calcium (as Xolafin-B™)."   Mimicking the package inserts for the PAMLAB PRODUCTS, Defendants represent in package inserts for the ACELLA PRODUCTS that Xolafin-B™ is the "primary biologically active isomer of folate and the primary form of folate in circulation," *i.e.*, L-methylfolate.   Defendants further promote the ACELLA PRODUCTS as stable products that will retain their labeled potency for at least two years after the date of manufacture, *i.e.*, have a two-year shelf life.

60.     In the spring and summer of 2010, Acella contacted national pharmaceutical databases and supplied those databases with information detailing and describing the ACELLA PRODUCTS as having "L-methylfolate calcium" in amounts identical to that used in the corresponding PAMLAB PRODUCTS.

61.     Notwithstanding, the Defendants' repeated claims that the ACELLA PRODUCTS use the ingredient L-methylfolate calcium, it does not.   "Xolafin-B™" is not the ingredient L-methylfolate calcium.   L-methylfolate calcium is defined as a diastereoisomerically pure

substance having less than 1% of the D diastereoisomer.  Thus, for example, the METAFOLIN ingredient used in the PAMLAB PRODUCTS always contains substantially less than 1% of the D diastereoisomer.

62.    On the other hand, the "Xolafin-B™" ingredient used in the ACELLA PRODUCTS is a mixture of both the D and L diastereoisomers (hereinafter, "D,L-methylfolate").    Testing shows that Xolafin-B™ is a "scalemic" compound containing approximately 7% of the D diastereoisomer.  Thus, the ACELLA PRODUCTS do not use L-methylfolate calcium.  Upon information and belief, LJ Pharma intentionally manufactures Xolafin-B™ to contain more than 1% of the D diastereoisomer.  Nonetheless, Defendants' labels, package inserts and other promotional materials state that the ACELLA PRODUCTS use the same quality ingredient, L-methylfolate calcium, in the same amounts as the corresponding PAMLAB PRODUCTS.  They do not mention D,L-methylfolate or the D diastereoisomer.

63.    In addition, Acella explicitly or implicitly represents that the ACELLA PRODUCTS have the same indications as the PAMLAB PRODUCTS and/or that the ACELLA PRODUCTS are substitutable for the PAMLAB PRODUCTS.

**Defendants Market The Acella Products as Generic Substitutes for the Pamlab Products**

64.    Despite the fact that the ACELLA PRODUCTS do not use the dietary ingredient L-methylfolate calcium, Defendants nevertheless market the ACELLA PRODUCTS to drug wholesalers, distributors, pharmacies, pharmacists and others as generic equivalents to and substitutes for the corresponding PAMLAB PRODUCTS.   Under the authorization and/or direction of Pugh and Deas, Acella has had these knock-off products linked to the PAMLAB PRODUCTS in national pharmaceutical databases that represent a major marketing

communications channel to drug wholesalers, pharmacies and others, and that are used by pharmacists to decide which drug product to dispense when filling a prescription.

65.     In its commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Acella has made no effort to differentiate the ACELLA PRODUCTS from the PAMLAB PRODUCTS other than on the basis of price.  Specifically, in commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Acella has described itself as a company marketing "generic" prescription drug products.  Defendants label the ACELLA PRODUCTS as generic equivalents and substitutes to the PAMLAB PRODUCTS.  In its commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Acella states and implies that Enfolast, Enfolast-N, L-Methylfolate Calcium Tablets, PNV Iron and PNV-DHA Plus have the same active ingredients in the same amounts as CEREFOLIN, CEREFOLIN-NAC, DEPLIN, NEEVO and NEEVO DHA respectively; are generic versions of and substitutes for CEREFOLIN, CEREFOLIN-NAC, DEPLIN, NEEVO and NEEVO DHA respectively; and have a two year shelf life.

66.     Acella seeks to capture market share from Pamlab by encouraging generic substitution of the ACELLA PRODUCTS for the PAMLAB PRODUCTS.

67.     Arizona is well aware that Acella advertises and promotes Enfolast, Enfolast-N, L-Methylfolate Calcium Tablets and PNV Iron as using L-methylfolate calcium, as generic equivalents to and substitutes for CEREFOLIN, CEREFOLIN-NAC, DEPLIN and NEEVO, respectively, and as having a two-year shelf life.  Arizona is also well aware that these claims are false because it manufactures Enfolast, Enfolast-N, L-Methylfolate Calcium Tablets and PNV Iron with D,L-methylfolate; on information and belief, it does not manufacture Enfolast,

Enfolast-N, L-Methylfolate Calcium Tablets and PNV Iron in accordance with good manufacturing practices; and on information and belief, it conducts neither finished product testing nor stability testing on the Enfolast, Enfolast-N, L-Methylfolate Calcium Tablets and PNV Iron to determine their release potency or shelf life.  Arizona nevertheless supplies these knock-offs to Acella.

68.    Best is well aware that Acella advertises and promotes PNV-DHA Plus as using L-methylfolate calcium, as a generic equivalent to and substitute for NEEVO DHA, and as having a two year shelf life.  Best is also well aware that these claims are false because it manufactures PNV-DHA Plus with D,L-methylfolate; on information and belief, it does not manufacture PNV-DHA Plus in accordance with good manufacturing practices; and on information and belief, it conducts neither finished product testing nor stability testing on PNV-DHA Plus to determine its release potency or shelf life.  Best nevertheless supplies this knock-off to Acella.

69.    LJ Pharma is well aware that Acella advertises and promotes the ACELLA PRODUCTS as using the ingredient L-methylfolate, calcium.  LJ Pharma is also well aware that these claims are false because it manufactures the D,L-methylfolate ingredient for Acella and it knows that this ingredient contains more than 1% of the D-methylfolate isomer.  LJ Pharma nevertheless supplies this ingredient to Acella.

70.    Defendants' efforts have had their intended effect; based upon Defendants' commercial advertising and promotion, drug databases as well as wholesalers, pharmacies and others "linked" the ACELLA PRODUCTS as generic equivalents to the PAMLAB PRODUCTS. As a result of Defendants' commercial advertising and promotion, wholesalers and pharmacies in the Eastern District of Louisiana and across the country have ceased to purchase the PAMLAB PRODUCTS, believing that the ACELLA PRODUCTS are available as generic substitutes.  This

could not occur unless Defendants had successfully created the false impression among drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain that the ACELLA PRODUCTS are stable products that are actually made with the ingredient L-methylfolate calcium, and are genuinely generic to and substitutable for the PAMLAB PRODUCTS.

**Defendants' Advertising is Literally False and Misleading**

71.     Notwithstanding Defendants' advertising and promotional claims on the ACELLA PRODUCTS' labels, package inserts and in other documents, the ACELLA PRODUCTS do not contain the same active ingredients in the same amounts as the PAMLAB PRODUCTS.

72.     Although Defendants advertise and promote the ACELLA PRODUCTS as using the same form of folate contained in the PAMLAB PRODUCTS, i.e., L-methylfolate calcium, the ACELLA PRODUCTS do not use L-methylfolate calcium in their formulation.  Instead, Defendants use D,L-methylfolate, an impure ingredient comprising a mixture of the L and D diastereoisomers.  In contrast, the PAMLAB PRODUCTS use L-methylfolate calcium.

73.     Defendants' claims concerning the strengths of the ACELLA PRODUCTS' ingredients and their shelf life are literally false.  Although Defendants advertise and promote the ACELLA PRODUCTS as having particular amounts of specific active ingredients, upon information and belief, Defendants do not use a validated manufacturing process to make the ACELLA PRODUCTS or perform any testing on the finished ACELLA PRODUCTS to establish their potency at release.  Although Defendants advertise and promote the ACELLA PRODUCTS as having a two year shelf life, on information and belief, Defendants have no empirical data on the ACELLA PRODUCTS that supports this claim.  Indeed, testing performed on the ACELLA PRODUCTS demonstrates that the active ingredients in the ACELLA

PRODUCTS undergo significant degradation and loss of potency within a few months after the ACELLA PRODUCTS are manufactured.

**The Acella Products are not Generic Equivalents to or Substitutes for the Pamlab Products**

74.     A pharmacist presented with a doctor's prescription for a brand-name product may fill that prescription by dispensing the brand-name product prescribed or an identical, "generic" version of the name-brand product.  This process is known as generic substitution.

75.     A generic product is identical – or therapeutically equivalent – to a brand name product in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.  Therapeutically equivalent products are both pharmaceutically equivalent and bioequivalent.

76.     Products are considered to be pharmaceutical equivalents if they contain the same ingredient(s), including the same active ingredient(s), they are of the same dosage form and route of administration, and they are identical in strength or concentration.  They must also meet identical standards of quality, purity and potency.

77.     Products are considered bioequivalent products if they deliver the active ingredients to the bloodstream at the same rate and with the same level of absorption.

78.     For pharmacists and other medical professionals, the requirement of bioequivalence ensures that a generic product substituted for the prescribed brand-name product is truly interchangeable and will provide the patient with the treatment the doctor ordered.  This is critical because the doctor, not the wholesaler, distributor or pharmacist, is responsible for making the appropriate treatment decisions and tracking the patient's progress.

79.     State law governs pharmacy practice, including generic substitution.  Most state laws explicitly require that a substitute product be both pharmaceutically equivalent as well as bioequivalent, and hence "therapeutically equivalent" to the drug prescribed.

80.     Thus, pharmacists and other medical professionals expect that a product advertised, promoted and sold as a generic will be pharmaceutically equivalent, bioequivalent and therapeutically equivalent to the brand-name product.

81.     Notwithstanding Defendants' advertising and promotional efforts, the ACELLA PRODUCTS are not generic equivalents to or substitutes for the PAMLAB PRODUCTS.  To begin with, Defendants use the dietary ingredient D,L-methylfolate in the ACELLA PRODUCTS and not L-methylfolate.  The ACELLA PRODUCTS are also unstable and undergo significant degradation and loss of potency within a few months of their manufacture.  Because the ACELLA PRODUCTS do not have the same active ingredients in the same amounts as the corresponding PAMLAB PRODUCTS, the ACELLA PRODUCTS are not pharmaceutically equivalent to the PAMLAB PRODUCTS.  Moreover, because upon information and belief, Arizona and Best do not manufacture the ACELLA PRODUCTS to meet the same standards of quality, purity and potency as the PAMLAB PRODUCTS, the ACELLA PRODUCTS cannot be pharmaceutically equivalent to the PAMLAB PRODUCTS.

82.     Defendants have not published or, upon information and belief, performed or commissioned any studies demonstrating that the ACELLA PRODUCTS deliver their active ingredients to patients at the same rate and in the same amount as the correspondingly labeled PAMLAB PRODUCTS.  Moreover, Defendants have not published or, upon information and belief, performed or commissioned any studies with regard to the effects of the D-methylfolate isomer in the human body when D,L-methylfolate is administered.  In the absence of testing, the ACELLA PRODUCTS cannot be presumed to be bioequivalent and therapeutically equivalent to

the PAMLAB PRODUCTS.    Indeed, the ACELLA PRODUCTS are not therapeutically equivalent to the correspondingly labeled PAMLAB PRODUCTS.

83.    Plaintiff has been and will continue to be harmed by Defendants' literally and impliedly false and misleading advertising and unfair competition.    Defendants' marketing efforts have misled consumers into believing that its products are generic equivalents to and substitutes for the PAMLAB PRODUCTS.    As a result, substitutions of the ACELLA PRODUCTS for the PAMLAB PRODUCTS have eroded and will continue to erode the PAMLAB PRODUCTS' sales and goodwill as well as Plaintiff's revenues.

84.    Plaintiff does not and cannot control the safety, effectiveness or quality of Defendants' inferior products.    Thus, doctors and patients who suffer bad experiences with the ACELLA PRODUCTS that are substituted for prescriptions of the PAMLAB PRODUCTS are likely to think less of Plaintiff and the PAMLAB PRODUCTS.

## COUNT 1:
## VIOLATION OF LANHAM ACT SECTION 43(A) (FALSE ADVERTISING)

85.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

86.    Acella's product labels, package inserts and other promotional marketing materials, which state that the ACELLA PRODUCTS use the dietary ingredient L-methylfolate calcium, that they contain specific ingredients in specific amounts, and have a two year shelf life are materially false statements that misrepresent the nature, characteristics and qualities of these products.    These are material misrepresentations upon which at least the public, marketplace, pharmacists, customers or potential customers have, and will rely.    Acella's actions therefore mislead and harm customers and consumers, among others, as well as damage Acella's sales,

good name and reputation in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

87.     As President and Chief Operating Officer respectively, Pugh and Deas have at all relevant times authorized, approved, supervised and/or directed ACELLA's literally and/or impliedly false and misleading advertising and have also had a direct financial interest in such activities.

88.     Arizona and Best are liable for false advertising under the Lanham Act because, upon information and belief, they falsely label the ACELLA PRODUCTS as using the ingredient L-methylfolate calcium, containing specific ingredients in specific amounts, and having a two year shelf life; and/or because they know or have reason to know of Acella's false and misleading advertising of the ACELLA PRODUCTS as using L-methylfolate calcium, and as generic equivalents to and substitutes for the PAMLAB PRODUCTS, but continue to supply the ACELLA PRODUCTS to Acella.

89.     LJ Pharma is liable for false advertising under the Lanham Act because it knows or has reason to know of Acella's false and misleading advertising of the ACELLA PRODUCTS as using L-methylfolate calcium, but continues to supply the D,L-methylfolate ingredient known as Xolafin-B™ to Acella.

90.     Additionally, Defendants are liable for false advertising under the Lanham Act because they intentionally induced and/or knew or had reason to know that drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain would falsely describe the ACELLA PRODUCTS as generics to and substitutes for the PAMLAB PRODUCTS to pharmacists, but continued to sell the products to those entities.

91.     By reason of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, damage to its business, reputations and goodwill.  Pursuant to 15 U.S.C. § 1117, Plaintiff

is entitled to damages for Defendants' Lanham Act violations, an accounting of profits made by Defendants on sales of its product, and recovery of Plaintiff's costs for this action.

92.    Given Defendants' knowledge that the ACELLA PRODUCTS are completely untested and use impure D,L-methylfolate as an ingredient, and not the dietary ingredient L-methylfolate calcium, Defendants' acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

93.    Unless enjoined by this Court, Defendants' acts will irreparably injure Plaintiff's goodwill and erode its market share.   Pursuant to 15 U.S.C. § 1116, Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants' continuing acts.

## COUNT 2:
## VIOLATION OF LANHAM ACT SECTION 43(A) (UNFAIR COMPETITION)

94.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

95.    Defendants' product labels, package inserts and marketing materials, which state that the ACELLA PRODUCTS use the dietary ingredient L-methylfolate calcium, are materially false statements.

96.    Such materially false statements have caused and are likely to continue to cause consumer confusion, mistake, or deception as to the origin, sponsorship or approval of the folate ingredient in the ACELLA PRODUCTS.

97.    Acella has willfully promoted the ACELLA PRODUCTS in interstate commerce so as to cause confusion or mistake among the public as to the origin, sponsorship or approval of the folate ingredient in the ACELLA PRODUCTS, all to Acella's profit and the public's and Plaintiff's damage.

98.     As President and Chief Operating Officer respectively, Pugh and Deas have at all relevant times, authorized, approved, supervised and/or directed ACELLA's unfair competition and have also had a direct financial interest in such activities.

99.     Arizona and Best are liable for unfair competition under the Lanham Act because upon information and belief, they falsely label the ACELLA PRODUCTS as using L-methylfolate calcium and/or they know or have reason to know of Acella's false and misleading advertising describing the ACELLA PRODUCTS as using L-methylfolate calcium and as generic equivalents to and substitutes for the PAMLAB PRODUCTS, yet aided and abetted those violations by continuing to supply the ACELLA PRODUCTS to Acella.

100.    LJ Pharma is liable for unfair competition under the Lanham Act because it knows or has reason to know of Acella's false and misleading advertising of the ACELLA PRODUCTS as using L-methylfolate calcium, but continues to supply the D,L-methylfolate ingredient known as Xolafin-B™ to Acella.

101.    Given Defendants' knowledge that the ACELLA PRODUCTS use impure D,L-methylfolate as an ingredient and not the dietary ingredient L-methylfolate calcium, the aforesaid acts were undertaken willfully and deliberately.

102.    Defendants' acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

103.    Additionally, Defendants are liable for unfair competition under the Lanham Act because they intentionally induced and/or knew or had reason to know that drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain falsely describe the ACELLA PRODUCT as a generic to and substitute for the PAMLAB PRODUCTS to pharmacists, but continued to sell the products to those entities.

104.    By reason of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, damage to its business, reputations and goodwill.  Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to damages for Defendants' Lanham Act violations, an accounting of profits made by Defendants on sales of the ACELLA PRODUCTS, and recovery of Plaintiff's costs for this action.

105.    Defendants' acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

106.    Unless enjoined by this Court, Defendants' acts will irreparably injure Plaintiff's goodwill and erode its market share.  Pursuant to 15 U.S.C. § 1116, Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants' continuing acts.

## COUNT 3:
### VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

107.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

108.    Defendants' conduct, including their false and misleading statements about the ACELLA PRODUCTS and the PAMLAB PRODUCTS, and palming off and improper substitution of the ACELLA PRODUCTS for the PAMLAB PRODUCTS violates Section 51:1405(A) of the Louisiana Unfair Trade Practices and Consumer Protection Law (UTPCPL) which declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

109.    The Defendants' unfair methods of competition and unfair or deceptive acts or practices include, but are not limited to, violations of Section 51:411 of the Louisiana Revised Statutes which provides in relevant part that, "[n]o person, with intent to sell or in any way

dispose of merchandise, . . . or anything directly or indirectly, to the public for sale or distribution, or with intent to increase the consumption, or to induce the public in any manner to enter into any obligation relating thereto, . . . shall make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in this state, . . . an advertisement of any sort regarding merchandise, securities, service or anything offered to the public, which advertisement contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

110.    As a result of Defendants' violations of the UTPCPL, Plaintiff has suffered and unless such acts and practices are enjoined by this Court, will continue to suffer, irreparable injury and damage to its business, reputation and goodwill for which it is entitled to relief.  In addition Plaintiff is entitled to damages and attorneys' fees for Defendants' UTPCPL violations.

<u>COUNT 4:</u>
**CIVIL CODE ART. 2315**

111.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

112.    Defendants' tortious conduct, including their false and misleading statements about the ACELLA PRODUCTS, the PAMLAB PRODUCTS and palming off and improper substitution of the ACELLA PRODUCTS for the PAMLAB PRODUCTS render Defendants solidarily liable to Plaintiff for damages to their business, reputation and goodwill.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

A.    A judgment and order that Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from directly or indirectly falsely advertising or

promoting the products or inducing others to substitute the ACELLA PRODUCTS for prescriptions of the PAMLAB PRODUCTS;

B.      A judgment and order that Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from making or inducing others to make any false, misleading or deceptive statement of fact, or representation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of its product in such fashion as to suggest that the ACELLA PRODUCTS use L-methylfolate calcium, have a two year shelf life, and/or are pharmaceutically equivalent, therapeutically equivalent, or bioequivalent to the corresponding PAMLAB PRODUCTS, or can be freely interchanged with or substituted for prescriptions of the PAMLAB PRODUCTS;

C.      A judgment and order that Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from placing, and are ordered to remove, information linking the ACELLA PRODUCTS to the PAMLAB PRODUCTS in any drug dispensing databases in the United States;

D.      A judgment and order that Defendants include in any advertisement or promotion comparing the ACELLA PRODUCTS with the PAMLAB PRODUCTS, whether oral or written, a notice in location and typeface as prominent as the comparison itself, that its products are "not pharmaceutically or therapeutically equivalent to [the corresponding PAMLAB PRODUCT]. Therefore, the substitution of this product for [the corresponding PAMLAB PRODUCT] may violate state law";

E.      A judgment and order that Defendants take corrective action to correct any erroneous impression persons may have derived concerning the nature, characteristics, or

qualities of the ACELLA PRODUCTS or the PAMLAB PRODUCTS, including without limitation the placement of corrective advertising to prevent the inducement of others from substituting the ACELLA PRODUCTS for prescriptions of the PAMLAB PRODUCTS;

F.      A judgment and order granting Plaintiff such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression concerning the nature, characteristics or qualities of the ACELLA PRODUCTS or from inducing others to substitute the ACELLA PRODUCTS for prescriptions of the PAMLAB PRODUCTS;

G.      A judgment and order requiring Defendants to pay Plaintiff damages under 15 U.S.C. § 1117(a) and La.R.S. 51:1409 in the amount of Plaintiff's actual and consequential damages and any profits of Defendants resulting from its advertisements and marketing of its products;

H.      A judgment and order requiring Defendants to pay Plaintiff all of its reasonable attorneys' fees, costs and expenses, including those available under 15 U.S.C. §1117(a) and any other applicable law;

I.      A judgment and order finding that this is an exceptional case and requiring Defendants to pay Plaintiff additional damages equal to three times the actual damages awarded Plaintiff pursuant to 15 U.S.C. § 1117(a), as well as all of Plaintiff's reasonable attorneys' fees under 15 U.S.C. § 1117(a) and any other applicable law;

J.      A judgment and order requiring Defendants to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded; and

K.      Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand that all issues be determined by jury.

Dated: January 19, 2011

Respectfully submitted,

**By:**     *s/Robert S. Rooth*
Robert S. Rooth, T.A. (# 11454)
Corinne A. Morrison (#9737)
Stephanie W. Cosse (#31677)
**CHAFFE McCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone: 504.585.7000
Telecopier: 504.544.6088

OF COUNSEL:
Saul Perloff (TX # 00795128)
Joseph A. Bourbois (TX # 00790342)
Katharyn Grant (TX # 24050683)
**FULBRIGHT & JAWORSKI L.L.P.**
300 Convent Street, Suite 2100
San Antonio, Texas 78205
Telephone: 210.224.5575
Telecopier: 210.270.7205

**ATTORNEYS FOR PLAINTIFF
PAMLAB, L.L.C.**